UNITED STATES DISTRICT COURT          FOR ONLINE
EASTERN DISTRICT OF NEW YORK          <u>PUBLICATION ONLY</u>
_____X

NORTH AMERICAN AIRLINES, INC.,

               Plaintiff,             MEMORANDUM
                                             AND ORDER
                                           05-CV-150 (JG)

         -against-

VIRGIN ATLANTIC AIRWAYS, LTD.,

               Defendant.
_____X

VIRGIN ATLANTIC AIRWAYS, LTD.,

               Third Party Plaintiff,

         -against-

AIRCRAFT SERVICE INTERNATIONAL,
INC. AND MACH II MAINTENANCE
CORPORATION,

               Third Party Defendants.
_____X


APPEARANCES:

       WILSON ELSER MOSKOWITZ EDELMAN & DICKER
            150 East 42nd Street
            New York, NY 10017-5639
       By:    Franklin F. Bass
            Attorneys for Plaintiff North American Airlines, Inc.

       CLYDE & CO US LLP
            The Chrysler Building
            405 Lexington Avenue
            New York, NY 10174
       By:    Christopher Carlsen
            Attorneys for Defendant Virgin Atlantic Airways, Ltd.

DOMBROFF & GILMORE, P.C.
　　　　40 Broad Street
　　　　New York, NY 10004
By:　　John R. Oh
　　　　Attorneys for Third-Party Defendant Aircraft Services International, Inc.

NIXON PEABODY LLP
　　　　50 Jericho Quadrangle
　　　　Suite 300
　　　　Jericho, NY 11753-2728
By:　　Raymond L. Mariani
　　　　Attorneys for Third-Party Defendant Aircraft Services International, Inc.

STEVENS & LEE
　　　　485 Madison Avenue - 20th Floor
　　　　New York, NY 10022
By:　　Bradley L. Mitchell
　　　　Attorneys for Third-Party Defendant Mach II Maintenance Corp.

JOHN GLEESON, United States District Judge:

On February 15, 2004, the right wing tip of a Virgin Atlantic Airways ("Virgin") aircraft collided with the tail of a parked North American Airlines ("NAA") aircraft while the Virgin plane was being towed towards a departure gate at John F. Kennedy International Airport ("JFK airport"). NAA has sued Virgin in this court, where subject matter jurisdiction is based on diversity of citizenship. In a third-party complaint, Virgin has sued Aircraft Services International, Inc. ("ASI"), and Mach II Maintenance Corp. ("Mach II"), the two companies that were involved in the towing operation, who in turn have entered cross-complaints against one another.[1] I have before me various motions for summary judgment. For the reasons set forth below, I (1) deny NAA's motion for summary judgment against Virgin; (2) deny in part and grant

---

[1]　　NAA has also sued ASI and Mach II in state court, alleging negligence. It brought no claims in this action against them because such claims would have defeated diversity jurisdiction, a fact that also precludes the exercise of supplemental jurisdiction over such claims. *See* 28 U.S.C. § 1367 (b).

in part Virgin's motion for summary judgment against ASI; (3) deny in part and grant in part

Mach II's motion for summary judgment against ASI.

BACKGROUND

A. The Collision

On the night of February 15, 2004, shortly after 8 p.m., a Virgin A340 aircraft was being towed from a parking area, or "hardstand," to a Terminal 4 departure gate at JFK airport. Before the tow, the Virgin aircraft was parked in hardstand number 76, with its tail facing Taxiway K. A double white line marks the boundary between the hardstand and the taxiway. At the center of the taxiway is a solid yellow line that contains imbedded blue lights. In a tow like the one in question, the tug driver attaches the front of a tug to the front of the aircraft by way of a tow bar, so that the aircraft and the tug are nose to nose. The tug driver then listens to a headset for a signal from the "brake rider" -- who sits in the cockpit of the aircraft during the tow -- that the control tower has given clearance for the tow to begin.

When moving an aircraft out of a hardstand and onto the taxiway, the tug driver first pushes the aircraft. During the push, the tug is driving forward and the aircraft is moving backwards. At this stage of the tow, called the "push-back," "wing walkers" typically walk near the wing tips to ensure that the wings do not collide with any objects, and signal the tug driver with eye contact and florescent wands. With the assistance of the wing walkers, the tug driver pushes the aircraft out of the hardstand until the aircraft has reached the yellow centerline of the taxiway, at which time the tug driver may begin to pull the aircraft forward down the center of the taxiway.

3

On February 15, 2004, the personnel involved in the tow included two ASI employees and one Mach II employee. Winston George, an employee of ASI, was driving the tug. Glenroy Phillips, also an ASI employee, was working as a wing walker under the left wing of the Virgin aircraft. The ASI supervisor that night determined that only one wing walker was necessary for the tow, since hardstand number 77, which was adjacent to the Virgin aircraft's right wing, was empty. Finally, Guillermo Rojas was employed as a brake rider for Mach II, and was sitting in the cockpit.

The tow began normally, with a signal from Rojas that the control tower had given clearance for the tow to begin. George began to push the aircraft out onto the taxiway. Shortly after George began to push, Rojas received direction from the control tower that the tow should stop temporarily so that another aircraft could pass on the taxiway. Rojas relayed the message to George, who stopped for several minutes until he received clearance to begin the tow again. Once George had pushed the nose of the aircraft to what he believed was the yellow center line of the taxiway, he shifted gears, put the tug into reverse, and began to pull the aircraft down the taxiway. When George stopped to shift gears, Phillips, the wing walker, left the scene. In order to pull the aircraft in a forward direction, George drove the tug in reverse by looking over his right shoulder and steering with his left hand. After approximately 100 feet, the right wing tip of the Virgin aircraft collided with the tail of an NAA aircraft that was parked in hardstand number 75.[2]

---

[2] Though multiple sources state that the NAA was parked in hardstand number 75, ASI has maintained that the NAA aircraft was parked in hardstand number 74. *See* ASI's Counterstatement of Material Facts in Response to Mach II, ¶ 19 (denying that the NAA aircraft was parked in hardstand number 75, and noting that it was instead parked in hardstand number 74). *Contra* JFK International Airport Incident/Accident Report Form; Virgin Atlantic Incident Report at 1; The Port Authority of NY & NJ - Motor Vehicle Accident Report; NAA Statement of Material Facts ¶ 4 (all stating that the NAA aircraft was parked in hardstand number 75).

George either (1) mistook the double white lines on the side of the taxiway for the yellow center line and therefore began to pull the aircraft forward prematurely, or (2) reached the yellow center line and began to pull from there, but strayed from the center line while pulling the aircraft. The evidence before me does not conclusively establish which of these two scenarios took place. *See* JFK International Airport Incident/Accident Report Form ("The ASIG push back driver, [Winston George], stated that he mistook the double white line that outlines the hardstand for the K centerline."); *contra* George Depo, 74 (stating that he pushed the Virgin aircraft back to the center yellow line). However, the answer to that question does not affect the liability of the parties.

According to NAA, its aircraft suffered extensive damage to its right rear stabilizer, causing the aircraft to be grounded for six days. Virgin claims that its aircraft sustained $145,702.97 in damages, and that Virgin incurred an additional $66,414.87 in costs associated with cancelling the flight that evening, booking passengers on alternative flights, and providing food and accommodation for passengers.

B.   The Parties' Claims

On January 10, 2005 NAA filed a complaint against Virgin, claiming liability under common law and statutory theories of negligence for damages to the NAA aircraft as well as for consequential damages suffered by NAA. On April 7, 2005, Virgin filed a third-party complaint against both ASI and Mach II, alleging that if Virgin is held liable for the damages suffered by NAA or its employees who were on board the NAA aircraft during the collision,[3] then Virgin is

---

[3]      Two NAA employees who were cleaning the inside of the NAA aircraft when it was struck by the Virgin aircraft have filed personal injury suits in New York state court against Virgin.

entitled to full indemnity, or to contribution, from both ASI and Mach II.  Virgin also alleges that

it is entitled to collect from ASI for its actual and consequential losses that resulted from the

physical damage to its own aircraft, either in full or in proportion to ASI's level of culpability.

Finally, Virgin alleges that the contractual agreement between ASI and Virgin requires ASI to

indemnify Virgin for the damage that ASI's negligence caused to the Virgin aircraft.[4]

On June 1, 2005, Mach II filed cross-claims against ASI, and on June 29, 2005,

ASI filed cross-claims against Mach II, which were amended on September 6, 2005.  Mach II

alleges that it is entitled to contribution or to full indemnity from ASI in the event that it is held

liable to Virgin for the damages suffered by NAA or its employees.  ASI alleges that it is entitled

to contribution or to full indemnity from Mach II in the event that ASI is held liable to Virgin for

the damages suffered by NAA or its employees, or for the damages suffered by Virgin itself.

C.      The Motions at Issue

Before me are three motions for summary judgment.

1.      *NAA's Motion for Summary Judgment Against Virgin*

NAA has moved for summary judgment on both of its liability claims against

Virgin, arguing that Virgin is statutorily liable to NAA for injuries to NAA's property pursuant to

New York General Business Law § 251, and also that Virgin is liable pursuant to a common law

theory of negligence for all damages resulting from the collision.

---

[4]      ASI and Virgin were signatories to a "Standard Ground Handling Agreement" ("Virgin/ASI Agreement"), providing in relevant part that "the Handling Company shall indemnify the Carrier against any physical loss or damage to the Carrier's Aircraft caused by the Handling Company's negligent operation of ground support equipment."  Virgin/ASI Agreement, Article 8.5.

2.     *Virgin's Motion for Summary Judgment Against ASI*

Virgin has moved for summary judgment against ASI on Virgin's claims that (1) based on ASI's negligence, which was the sole cause of the accident, Virgin is entitled to full indemnity from ASI for the damages suffered by NAA or its employees who were on board the NAA aircraft during the collision (Claim 1 of the third-party complaint); (2) based on ASI's negligence, which was the sole cause of the accident, Virgin is entitled to recover from ASI for the actual and consequential damages that Virgin incurred as a result of the damage to its own aircraft (Claim 3 of the third-party complaint); (3)  based on ASI's negligence, which was the partial cause of the accident, Virgin is entitled to recover from ASI for the actual and consequential damages that it incurred as a result of the damage to its own aircraft (Claim 4 of the third-party complaint)[5]; (4) based upon the Virgin/ASI Agreement, Virgin is entitled to recover from ASI for the actual and consequential losses associated with the damage sustained by the Virgin aircraft (Claim 5 of the third-party complaint).

3.     *Mach II's Motion for Summary Judgment Against ASI*

Mach II seeks summary judgment on ASI's four cross-claims against Mach II, arguing that because Mach II performed its brake rider duties without fault, any future effort on ASI's part to seek indemnification or contribution from Mach II must fail.

---

[5]     In the event it does not prevail on its principal claim that ASI is solely responsible, Virgin has alleged this alternative claim, which is complemented by a pair of negligence claims against Mach II that seek indemnification for any damages Virgin is found to owe NAA.  Virgin's causes of action against Mach II are not at issue here.

DISCUSSION

A.     <u>The Standard of Review</u>

        Summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Courts must determine whether or not a genuine issue of material fact exists by examining the evidence in the light most favorable to the non-moving party.  *See Lucente v. Int'l Bus. Machines Corp*., 310 F.3d 243, 253 (2d Cir. 2002).  On summary judgment, "the evidence of the non-movant is to be believed."  *Id*. at 254 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)).

        Pursuant to those principles, I am primarily concerned at this stage with determining "whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.  An alleged factual dispute regarding immaterial or minor facts between the parties will not defeat an otherwise properly supported motion for summary judgment. *See Howard v. Gleason Corp*., 901 F.2d 1154, 1159 (2d Cir.1990).  Moreover, the non-moving party may not defeat a summary judgment motion by presenting a "mere scintilla" of evidence in support of its own position.  *Anderson*, 477 U.S. at 252; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (Nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.").  Instead, "there must be evidence on which a jury could reasonably find for the nonmovant."  *Anderson*, 477 U.S. at 252.

B.    NAA's Motion for Summary Judgment Against Virgin

NAA's motion for summary judgment against Virgin depends upon (1) whether New York Business Law § 251 applies in this type of case; and (2) whether a reasonable jury could conclude that Virgin was not negligent in connection with the accident.  I hold that § 251 does not apply to a collision that takes place when a commercial aircraft is being towed.  I also find that a reasonable jury could conclude that Virgin is not liable on negligence grounds for the damages resulting from the collision in this case.  Accordingly, I deny summary judgment on NAA's claims against Virgin in their entirety.

1.    *The Scope of New York General Business Law § 251*

New York General Business Law § 251 states in relevant part as follows:

> [E]very owner of an aircraft shall be liable and responsible for death occasioned or injuries to person or property sustained, within or above this state, as a result of the use or operation of the aircraft in the business of the owner or otherwise, by any person using or operating the aircraft with the permission, express or implied, of such owner, in any case where the person using or operating the aircraft, or his estate, would be liable for such death or injuries.

N.Y. Gen. Bus. § 251(1) (McKinney 1959).  NAA argues that the statute clearly imposes liability on Virgin, since it is not disputed that ASI and Mach II were towing the Virgin aircraft with Virgin's permission and that the negligent conduct of ASI and/or Mach II led to NAA's damages. Virgin counters that § 251 does not apply to NAA's claims.

As discussed below, the plain meaning of § 251 does not answer the question, since it is not clear that the towing of an aircraft is a form of "using or operating" the aircraft for the purposes of the statute.  Upon the necessary examination of the purpose and legislative history

of the statute, and of the key difference between § 251 and the analogous provision in the Vehicle & Traffic Law, I conclude that it does not apply to this case.

a.      *The Plain Meaning of § 251*

The interpretation of a New York statute, like the interpretation of a federal law, begins with the plain meaning of the words used. *See Council of City of New York v. Guliani*, 93 N.Y.2d 60, 69-70 (1999). However, "[l]iteral meanings of words are not to be adhered to or suffered to 'defeat the general purpose and manifest policy intended to be promoted.'" *Id*. at 70 (quoting *People v. Ryan*, 274 N.Y. 149, 152 (1937)).

Although it is clear that the collision in this case resulted from negligent "use or operation" of the *tug*, the same cannot be said about the Virgin aircraft itself. The normal meaning and usage of those words simply does not fit the facts here. Just as it would be odd to suggest that a tow-truck driver "uses" or "operates" the car hooked to the back of the tow truck, to say that ASI or Mach II were using or operating Virgin's aircraft does not accurately capture what they were doing. They were towing it, not using it. On the other hand, the text of the statute at least arguably does not unequivocally *exclude* the towing operation at issue here. A brake rider sits in the cockpit and "uses" some of the towed aircraft's equipment, and a tug driver "uses" the part of the aircraft that attaches to the tow bar. As a result, the scope of the statute is properly informed by its legislative history and the policy behind its enactment.

b.      *The History and Structure of § 251*

According to the Notes of the Commission attached to § 251, one purpose behind the law was "to extend to aircraft the principles of section [388] of the Vehicle and Traffic Law."

Notes of the Commission, N.Y. Gen. Bus. § 251.[6] The "driving force" behind New York Vehicle & Traffic Law § 388 was to allow "victims of motor vehicle accidents to have recourse to a financially responsible defendant." *Connecticut Indemnity Co. v. 21st Century Transport Co., Inc.*, 186 F. Supp. 2d 264, 270-71 (E.D.N.Y. 2002) (citing *Morris v. Snappy Car Rental*, 84 N.Y.2d 21, 29 (1994)). Section 388 was also intended to (1) "increase the responsibility of automobile owners for the operation of their vehicles," *White v. Smith*, 398 F.Supp. 130, 136 (D.N.J. 1975); and (2) "'discourage owners from lending their vehicles to incompetent or irresponsible drivers.'" *Id.* (quoting Report of the New York Law Revision Commission at 593 (1958)).

The legislative history of § 251 reveals a similar concern for victims of aircraft accidents in light of the rise in private ownership of non-commercial aircraft, and the corresponding increase in the non-owner operation of such aircraft. Included among the submissions to the legislature was a letter from the New York Law Review Commission describing the "frequency of cases in which aircraft accidents may occur while the aircraft is being used or operated by a person other than the owner, in circumstances not amounting to the business of the owner." Recommendation of the New York Law Review Commission to the Legislature, Senate Int. No. 860, Assembly Int. No. 1733, at 1-2. The New York Department of Insurance also advised the legislature that the proposed legislation was in the public interest because it would "provide a remedy to persons injured through the operation of [private] aircraft

---

[6]    The language of § 251 closely tracks that of Vehicle & Traffic Law § 388(1), which states, "Every owner of a vehicle used or operated in this state shall be liable and responsible for death or injuries to person or property resulting from negligence in the use or operation of such vehicle, in the business of such owner or otherwise, by any person using or operating the same with the permission, express or implied, of such owner."

against the owner, without whose conduct in permitting its use the accident would not have occurred." State of New York, Dept. of Insurance, Memorandum to the Governor Re Assembly Print No. 1741, Int. No. 1733, dated March 13, 1959. Finally, responding to the Governor's request for comment regarding the proposed law, a representative of the New York Law Revision Commission reported that § 251 "would have little or no practical importance for commercial air transportation, since planes operated by air carriers are operated by employees . . . ." Letter from Laura T. Mulvaney, State of New York Law Revision Commission, to Roswell Perkins, Counsel to the New York State Governor, March 10, 1959. The letter continues, "[T]he increasing number of privately owned planes . . . create[s] a situation paralleling closely the situation that lead to the enactment of section [388] of the Vehicle and Traffic Law." *Id.*

Thus, the legislative history of § 251 makes clear that the statute was intended to ensure that victims of private, general aviation aircraft accidents have recourse to a financially responsible defendant -- the owner of the aircraft -- when a non-owner pilot crashes the aircraft. Nothing in the origin or purpose of the statute suggests that the words "use or operation" included the towing of an aircraft.

Moreover, further comparison with Vehicle & Traffic Law § 388(1) strongly suggests exactly the opposite. Section 388(1) includes additional language that imposes liability on an owner for damages taking place during a tow of the vehicle:

> Whenever any vehicles as hereinafter defined shall be used in combination with one another, *by attachment or tow*, the person using or operating any one vehicle shall, for the purposes of this section, be deemed to be using or operating each vehicle in the combination, and the owners thereof shall be jointly and severally liable hereunder.

(emphasis added). Section 251 does not contain this language specifically addressing towing. The omission is important for two reasons. First, the legislature's choice when enacting § 251 to track the language of Vehicle & Traffic Law § 388 almost exactly, but to exclude the portion of that statute that makes an owner liable for damages occurring during a tow, is powerful evidence of a legislative intent to exclude commercial aircraft towing from an owner's realm of liability under § 251. Second, the provision sheds significant light on what "use" and "operate" mean in the parts of § 251 and § 388(1) that parallel each other. Obviously, if those words were meant to embrace the *towing* of vehicles, the additional language in § 388(1) would have been unnecessary.

Based on the language, the history and the structure of § 251, I conclude that Virgin cannot be held liable under that statute in the circumstances of this case. I therefore deny NAA's motion for summary judgment on that ground.

2.      *Virgin's Common Law Liability*

NAA also argues that Virgin is liable for all of NAA's damages resulting from the collision under principles of common law negligence. NAA contends that ASI and Mach II were Virgin's agents, so Virgin is vicariously liable for the damages that they caused.

"Underlying the doctrine of vicarious liability is the notion of authority or control over the alleged wrongdoer." *Hilliard v. Roc-Newark Associates*, 287 N.Y.S.2d 421, 692 (2d Dep't 2001); *see also Gonzales v. Nussbaum*, 71 N.Y.2d 535, 546 (1988) (one purpose of vicarious liability is to encourage employers to act carefully in the selection and supervision of its employees.). Where an independent contractor, not an employee or an agent, has acted negligently, vicarious liability does not apply to the person who hired the independent contractor. To distinguish between an employee and an independent contractor, "[t]he test is the existence of

13

a right of control over the agent in respect of the manner in which his work is to be done. A servant is an agent who works under supervision and direction of his employer; an independent contractor is one who is his own master." *In re Morton*, 284 N.Y. 167, 172 (1940).

NAA asserts that ASI and/or Mach II were Virgin's agents, rather than independent contractors, because Virgin (1) directed them as to when and where to tow the aircraft in question; (2) provided towing procedures to be used, and required that they be used; and (3) audited ASI and Mach II for the quality of training and the competence of the towing operations. Virgin counters that ASI and Mach II were independent contractors because Virgin had no role in interviewing, hiring, training, supervising, or firing any ASI or Mach II employee, and because the equipment used to tow the aircraft, including the tug, was supplied by ASI and Mach II. Though Virgin notified ASI and Mach II managers of when and where specific aircraft needed to be towed, ASI and Mach II managers directly assigned the employees to accomplish the tow. Virgin also asserts that its practice of periodically auditing ASI and Mach II training procedures, like its decision to provide ASI with a copy of its towing procedures, does not constitute the sort of supervision and direction that render ASI and Mach II servants for the purposes of vicarious liability. Finally, Virgin points out that the Virgin/ASI Agreement, at ¶ 17, specifically provides that ASI was acting as an independent contractor.

Virgin has the better of this argument. At the very least, given Virgin's limited role in the hiring and supervision of the ASI and Mach II employees, a reasonable jury could

conclude that ASI and Mach II were independent contractors.[7]  NAA's motion for summary

judgment is thus denied on this ground as well.[8]

C.      Virgin's Motion for Summary Judgment Against ASI

A reasonable jury could decline to find that Virgin has met its burden of showing

by a preponderance of the evidence that ASI was (1) solely responsible for the collision that led to

the damages sustained by NAA and certain NAA employees; or (2) solely responsible for the

collision that resulted in actual and consequential damages to Virgin.  For that reason, I deny

Virgin's motion for summary judgment as to Claims 1 and 3 of its third-party complaint.

However, I grant partial summary judgment to Virgin on Claim 4 of its complaint, because I find

that no reasonable jury could fail to conclude that ASI was in some measure responsible for the

collision with the NAA aircraft.  Moreover, ASI is contractually obligated to indemnify Virgin

against damage to Virgin aircraft that results from ASI's negligent operation of ground support

equipment, such as a tug.  ASI is therefore liable for the actual costs incurred as a result of the

damage to the Virgin aircraft.  I do not, however, agree that ASI is liable for consequential

damages suffered by Virgin, since the same contract forecloses that result unless the damages

were caused intentionally or recklessly.  Therefore, I do not grant summary judgment in full as to

---

[7]      Virgin has not cross-moved on this issue, so I need not decide whether, as a matter of law, ASI
and Mach II were independent contractors.

[8]      NAA argues in its reply brief that various documents -- the JFK License Agreement, the Port
Authority Air Terminal Rules, and Virgin's Airport Services Ramp Manual -- imposed duties upon Virgin to
prevent the unsafe movement of its aircraft, regardless of whether or not independent contractors or employees of
the airline were moving the aircraft.  But even assuming *arguendo* that the documents cited by NAA establish
standards of care, NAA has adduced no evidence that Virgin violated any of these standards.  For example, the
JFK License Agreement requires airlines to conduct all operations "in a safe and careful manner."  NAA does not
state how Virgin failed to abide by this standard.

Claim 4 of Virgin's third-party complaint. For the same reasons, I grant summary judgment to Virgin on Claim 5 with respect to actual damages but not with respect to consequential damages.

1. *The Claims for Full Indemnification -- Mach II's Liability*

Virgin seeks summary judgment on its claims for full indemnity from ASI. ASI correctly contends that such relief cannot be granted against one party where questions of fact remain as to whether another party shares responsibility for the accident. *See Edholm v. Smithtown DiCanio Org.*, 629 N.Y.S.2d 86, 88 (2d Dep't 1995). Thus, summary judgment on Virgin's claim of full indemnity cannot be granted against ASI if Mach II was in any way negligent. ASI asserts that an issue of fact remains as to the degree of Mach II's culpability.[9]

a. *Mach II's Duty of Care*

"Under New York law," which is controlling here, a party "must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111,114 (2d Cir. 2000) (citing *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981)). A duty "is thus a sine qua non of a negligence claim" *Id*. Furthermore, "[u]nlike foreseeability and causation, which are issues generally and more suitably entrusted to fact finder adjudication, the definition of the existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for Judges to make prior to submitting anything to fact-finding or jury consideration." *Palka v. Servicemaster Mgmt. Services Corp.*, 83 N.Y.2d 579, 585 (1994).

---

[9]     ASI also claims that Virgin was negligent, further precluding Virgin's ability to seek full indemnity from ASI. As discussed below, my resolution of the issue regarding Mach II eliminates the need to address that dubious claim.

There is no "algebraic formula" that aids a court in determining whether a duty exists; the answer instead "coalesces from vectored forces." *Id.* Among the factors to consider are the nature of any relevant contractual relationship and the notion of ordinary care. As Judge Cardozo concluded, "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation." *Palsgraf v. Long Is. R.R. Co.*, 248 N.Y. 339, 344 (1928). *See also Turcotte v. Fell*, 68 N.Y.2d 432, 437 (1986) ("[T]he determination of the existence of a duty and the concomitant scope of that duty involve a consideration not only of the wrongfulness of the defendant's action or inaction, they also necessitate an examination of [the] plaintiff's reasonable expectations of the care owed him by others."); *Havas v. Victory Paper Stock Co.*, 49 N.Y.2d 381, 386, (1980) ("Whenever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to the circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger.") (quoting *Heaven v. Prender*, 11 QBD 503, 509, Brett, MR (1883)).[10]

According to ASI, a brake rider has the duty to constantly monitor for any risk of collision while the aircraft is being towed, and to prevent that collision from taking place. Mach II had this duty, the argument goes, because the brake rider holds a position of authority and control over the towing operation due to his direct line of communication with the control tower and his ability to order the tug driver to stop or resume towing.

---

[10] Though the parties apparently have factual disagreements about the typical responsibilities of brake riders, there is no dispute that the scope of a brake rider's duty should be determined by me as a matter of law on the current record.

For its part, Virgin claims that a brake rider has the following duties:

(1) communicating with the airport control tower; (2) relaying instructions from the control tower to the tug driver; (3) monitoring the aircraft's various systems through use of the instrument panel and controls located in the cockpit; and (4) applying the aircraft brakes in the event that the tow bar connecting the aircraft to the tug breaks or otherwise becomes detached.

Those duties do not include looking out the cockpit windows.

Virgin concedes that it is possible for a brake rider to look out the window, and that a brake rider who happens to be looking out the window and observes an imminent collision while doing so has a duty to inform the tug driver. But Virgin contends that it is not the brake rider's duty to investigate whether any objects are in the path of the tow. If it was, Virgin claims, then the brake rider would not be able to give adequate focus to his or her tasks within the cockpit. *See also* Fisher Depo., 62-64 (noting that the brake rider must divide his attention between the blue brake pressure indicator, located 18 inches below the windshield, and other systems indicators that are located above the windshield).

The breadth of a brake rider's duty of care should be determined in light of the duties of other personnel conducting the tow. If the duty to monitor for possible obstacles in the path of the aircraft during the tow has not been assigned elsewhere, then it may be appropriate to assign at least a portion of that duty to the brake rider. If, however, other personnel have a specific duty to prevent the aircraft from colliding with objects during a tow, then it is less appropriate to attach this duty to the brake rider.

It is the wing walker's duty to escort the aircraft as it moves to make sure that it does not hit anything until it reaches a "safe area." *See* Sewell Depo., 92. The wing walker determines when a towed aircraft is clear of danger, and is trained to ensure that the aircraft can

move safely before leaving the scene of a tow.  *Id.*  Generally, once the nose of an aircraft is on the center line and the wing is clear of the double white line, then the aircraft will be clear.  Fisher Depo., 38.

The tug driver is responsible for the speed and direction of the aircraft during a tow.  At the end of the push-back phase, the tug driver must ensure that the nose of the aircraft is on the yellow center line of the taxiway.  Sewell Depo., 147  From that point forward, the tug driver is primarily responsible for aircraft clearance.  *Id*. at 175.  A tug driver is also primarily responsible for determining whether conditions permit his visibility to safely conduct the tow.  Fisher Depo., 32.

As *Palsgraf* teaches, the risk reasonably to be perceived defines the duty to be obeyed.  The players in the best position to avoid the risk of collision when an aircraft is being towed are the tug driver and the wing walker.  The tug driver is responsible for the aircraft's movement and the wing walker is responsible for signaling the tug driver if the wings are on a collision course with any obstacles.  The brake rider, by contrast, though stationed in the cockpit, is far less able to avoid the risk of collision.  During the push-back, when the aircraft is moving backwards, it is impossible for the brake rider to observe any obstacles in the path of the tow.[11] After the push-back phase is complete, if the wings are not clear it is the wing walker -- not the brake rider -- who is charged with saying so.  Once the wing walker signals that the wings are clear, it is the tug driver -- not the brake rider -- who must keep the tug and the aircraft on the center line.

---

[11] The only significant exception to that statement relates to the risk of collision when a brake rider fails to notify the tug driver, pursuant to communications from the control tower, to stop the tow so that another aircraft may pass on the taxiway.  All parties agree that Rojas performed that duty adequately.

For these reasons, I hold that the law does not impose a duty on the brake rider to monitor the taxiway for potential collisions with obstacles outside the aircraft. Indeed, close attention to objects outside the aircraft would make it impossible for the brake rider to conduct the necessary tasks within the cockpit. *See* Fisher Depo., 58 (noting that the brake rider is not trained to watch out for obstacles).

Instead, I conclude that the brake rider has the following duty: if a brake rider in an aircraft cockpit perceives, or should perceive, an obvious risk of collision with an object during the tow, the brake rider must exercise due care to notify the tug driver of that risk and, if necessary, take additional steps from his or her position in the cockpit to prevent the collision. Given the brake rider's responsibilities within the cockpit, however, such as monitoring instrument panels and listening to radio transmissions from the control tower, it is not the brake rider's duty to keep a lookout for objects that may pose a risk of collision outside the aircraft, nor is it the brake rider's responsibility to monitor whether or not the tug driver has strayed from the center line of the taxiway.

b. *Whether Mach II Breached its Duty*

ASI claims that Mach II breached its duty because Rojas had an elevated vantage point from the pilot seat of the Virgin aircraft's cockpit and he failed to observe and prevent the collision. ASI also claims that Mach II breached its duty because Rojas and other Mach II personnel knew that the taxiway center lights were not working that night, but failed to notify the tug driver of the problem or to turn on the exterior lighting of the aircraft to illuminate the taxiway. Finally, ASI claims that Mach II breached its duty because it trained Rojas on a different

20

airline's A340 aircraft rather than on a Virgin aircraft, and because it generally failed to adhere to Virgin's towing procedures.

I am not persuaded by the latter two arguments. Rojas received extensive on-the-job training on an A340 aircraft. *See* Fisher Depo., 13. The fact that Virgin did not own that aircraft did not render Rojas unqualified, and ASI has referred to no general industry practice that requires separate training to take place with respect to each airline that a company like Mach II services. Furthermore, Mach II trained its employees pursuant to the Aircraft Manufacturer's Maintenance Manual ("Maintenance Manual"), which was substantially similar to Virgin's own procedures. Use of the Maintenance Manual instead of Virgin-specific procedures did not constitute a breach of duty.

As for the failure to illuminate claim; the standard practice is to use only the beacon lights and the navigation lights during a tow. *See Rojas* Depo., 46. In fact, there is evidence that the use of other lights could temporarily blind the tow driver. *See Fisher* Depo., 29. Given this information, Rojas did not breach a duty by illuminating only the beacon lights and the navigation lights during the tow.

There are, however, two issues of fact that may need resolution by a jury. The first concerns the conditions in the cockpit, and whether Rojas should have perceived an obvious risk of collision. As mentioned above, merely because Rojas sat in an elevated position does not mean he had a duty to monitor events outside the aircraft. Moreover, the actual point of collision here -- the right wing tip of the Virgin aircraft -- was apparently outside Rojas's field of view from where he sat in the cockpit. Still, in light of the fact that the Virgin aircraft was towed some

distance before it made contact with the NAA aircraft, I cannot say as a matter of law on the record before me that Rojas did not breach the narrow duty I have ascribed to brake riders.

Similarly, it is doubtful that Mach II's failure to notify ASI that several of the blue lights imbedded in the center line of the taxiway were inoperable constituted a breach of duty. In light of the evidence that the lights had not been working for several days, during which time any number of personnel -- including ASI personnel -- did not take immediate corrective action, it is unlikely that the inoperable lights presented a sufficient risk of collision to trigger a duty on Rojas's part to inform the tug driver. Still, I decline on the current record to conclude that no rational jury could agree with ASI's interpretation of events.

Although both of the foregoing factual issues may need to be revisited at the close of ASI's evidence, summary judgment in Virgin's favor is not warranted at this time.[12]

2.    *The Virgin/ASI Agreement*

Virgin argues that the Virgin/ASI Agreement requires ASI to compensate Virgin for its actual and consequential losses as a result of the damage to the Virgin aircraft. Virgin's claim for actual damages stems from Article 8.5 of the Agreement, which states that ASI "shall indemnify [Virgin] against any physical loss or damage to [Virgin's] aircraft caused by [ASI's] negligent operation of ground support equipment." Virgin's claim for consequential losses is based on Article 8.1, which generally limits claims against ASI for damages to Virgin's property, including consequential damages, unless ASI acted intentionally or recklessly.

---

[12]    I do not consider now whether the events in this case are governed by Article 8.2 of the Virgin/ASI Agreement's "hold harmless" clause related to third-party property damage such as the damage suffered by NAA and its employees.

ASI argues that Virgin can recover under Article 8.5 of the Virgin/ASI Agreement only if ASI was the *sole* cause of the accident. I find no basis for this conclusion in the agreement, which binds ASI to indemnify Virgin for damage caused by ASI's "negligent operation of ground support equipment." ASI's employee clearly operated the tug in a negligent manner. No rational jury could conclude otherwise. The agreement does not address whether there were additional negligent actors involved. Therefore, I grant summary judgment to Virgin on its claim against ASI for indemnification for actual damages to its own aircraft.

As mentioned above, Article 8.1 does not foreclose Virgin's claims for consequential damages if ASI's employees acted recklessly. However, I decline to find as a matter of law that ASI employees acted recklessly in this case. Therefore, I deny summary judgment on Virgin's claim that it may collect from ASI for these consequential losses.

D.     Mach II's Motion for Summary Judgment Against ASI

Mach II's motion for summary judgment against ASI, like Virgin's motion for summary judgment against ASI, turns on whether a rational jury could find that Mach II's brake rider was partially responsible for the collision. Though no rational jury could conclude that Mach II was *entirely* at fault for the collision that took place in this case -- and I therefore grant Mach II's motion for summary judgment as to ASI's two claims for full indemnity -- as discussed above, questions of fact remain as to whether Mach II was partially negligent for the collision. Accordingly, I decline to enter summary judgment in favor of Mach II on the two contribution claims.

23

## CONCLUSION

For the foregoing reasons, I (1) deny NAA's motion for summary judgment against Virgin; (2) grant in part and deny in part Virgin's motion for summary judgment against ASI; and (3) grant in part and deny in part Mach II's motion for summary judgment against ASI. Jury selection and trial will occur on March 19, 2007. A final pretrial conference will be held on Friday, March 9, 2007, at 10 a.m.

So Ordered.


John Gleeson, U.S.D.J.

Dated: December 22, 2006
      Brooklyn, New York